UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERICA D'ANTONIO,

        Plaintiff,

-against-

ANDREW BRETTSCHNEIDER,

        Defendant.

---

Civil Index No. 17-cv-09951

**AMENDED COMPLAINT**

**JURY DEMANDED**

Plaintiff, ERICA D'ANTONIO, by her attorneys, Weg & Myers, P.C., as and for her Complaint against Defendant ANDREW BRETTSCHNEIDER, alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action which stems from, *inter alia*, Defendant's misuse of $150,000 in funding provided to him in connection with a start-up for a company and in exchange for shares of a company. As it has turned out, Defendant continually made misrepresentations and bold-faced lies to Plaintiff and took advantage of their supposed friendship, using these funds to satisfy other unrelated outstanding debts and leaving Plaintiff high and dry.

2. As a result, Plaintiff seeks the return of her funds, as well as punitive damages.

## PARTIES

3. At all times herein mentioned, Plaintiff ERICA D'ANTONIO (hereinafter "Plaintiff") is a natural person having her primary residence in Connecticut.

1

4. At all times hereinafter mentioned, Defendant ANDREW BRETTSCHNEIDER (hereinafter "ANDY" or "Defendant") is a natural person whose primary residence was at 433 East 74th Street in the County of New York, New York. Defendant currently resides at 7080 Mullholland Drive, Los Angeles, California.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 as the parties are citizens of this state and a foreign state and the amount in controversy exceeds the statutory minimum of $75,000.

6. Venue is also proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to these issues occurred within the geographical confines of the Southern District of New York.

## BACKGROUND FACTS

7. Plaintiff, Defendant and Defendant's wife ALISON were close friends for over 35 years.

8. On or around March 27, 2015, while on a visit to Plaintiff's home, ANDY and/or ALISON approached Plaintiff about a potential investment opportunity.

9. Specifically, ANDY informed Plaintiff that he was about to launch a company called PLAYDAY INC. (hereinafter "PLAYDAY"), which would host online fantasy football in much the same way that existing companies Fan Duel and Draft Kings did.

10. Fantasy football is an online game whereby, in general terms, customers select real-life NFL players, and then accumulate points based on the athletes' performance. The teams with the most points are then compensated in some monetary way.

11. Defendant advised Plaintiff that he believed PLAYDAY would be an immediate financial success and further informed Plaintiff that the project was fully funded by $3,000,000 of his own money and in excess of $10,000,000 from a hedge fund, celebrity investors, and mutual friends. For example, Defendant indicated that Shawn "Jay-Z" Carter, Dwyane Wade, other members of the Miami Heat National Basketball Association team, and other Roc Nation artists were among his many investors.

12. Defendant offered to allow Plaintiff to invest so that she, too, could share in the profits.

13. Defendant had also previously indicated to Plaintiff that he was a successful owner and operator of Varsity Bus Company, and that he and his wife ALISON also owned a purportedly successful chain of retail stores under trade names with variations of "25 Park LLC," falsely portraying himself as someone in possession of great wealth.

14. In truth, the 25 Park LLC brand was defunct and subject to numerous lawsuits by its suppliers. The Varsity Bus Company, which was begun by Defendant's grandfather and which Defendant only partly owned, had also been sold, and lawsuits were pending against Defendant related to the company's employee pension fund. Indeed, as was later learned, in 2012, Defendant and his wife defaulted on a personal guarantee to return wrongfully diverted pension funds. By March 27, 2015, Defendant, his wife, and their company had been named in over 10 lawsuits seeking aggregate damages in excess of $7,000,000. None of this information had been disclosed to Plaintiff during the solicitation process.

15. Based on these representations, Plaintiff was incorrectly led to believe that Defendant had the requisite business acumen and great wealth necessary to start a company of this magnitude.

16. Defendant, aware of Plaintiff's fears regarding withdrawing the funds from her own investment account, which included her daughter's college fund, further told Plaintiff that if PLAYDAY wasn't successful, he would give her all of her money back.

**PLAINTIFF'S PAYMENT AND DEFENDANT'S FAILURE TO FUND PLAYDAY**

17. Code and Theory (hereinafter, "Code") is an interactive creative and design agency which builds, supports and markets specific internet-based projects.

18. Defendant entered into an agreement with Code to build PLAYDAY.

19. Under their agreement, Defendant was to give the idea to Code, and Code was to make the idea come to life in exchange for money.

20. Code's fees would eventually exceed $1,000,000.

21. According to a complaint filed by Code against Defendant, these fees have not been paid. A copy of this Complaint has been attached hereto as Exhibit "A."

22. According to the complaint filed by Code against Defendant, on or around March 27, 2015, Defendant was required to make a progress payment of $150,000.

23. In or around the same timeframe of March 27, 2015, Defendant reached out from his location in New York to Plaintiff to induce her to give him money as part of his scheme to defraud and he sent her a document entitled "summary of terms convertible promissory note financing" (hereinafter "financing summary") via e-mail. A copy of the financing summary is attached herein as Exhibit "B."

24. The top of the financing summary reads as follows:

> "This term sheet summarizes the principal terms of the **proposed** financing of PlayDay Enterprises Inc. This term sheet is for **discussion purposes only**; there is **no obligation** on the part of any negotiation party **until a definitive note purchase agreement is signed** by all parties. The transactions contemplated by this term sheet are **subject to the satisfactory completion of due diligence**.

4

> This term sheet does not constitute either an offer to sell or an offer to purchase securities" (emphasis added). *Id*.

25. Despite the clear language that the financing term sheet summary is not evidence of an agreement to lend or invest, Defendant claimed that Plaintiff would have to sign it and send it back with a check made payable to him for $150,000 to reserve her position in the company while the other details were to be worked out.

26. Defendant further directed the Plaintiff to make the check payable to him personally, even though the financing summary was in the name of the company.

27. Based on her trust of Defendant, as well as his prior representations that the investment would succeed and that Defendant would refund her money if it did not, Plaintiff sent a check for $150,000 made payable to Defendant together with the signed financing summary on March 31, 2015. A copy of the check is attached herein as Exhibit "C." The check identified as Exhibit C was mailed to Defendant in New York, at his request.

28. Defendant never sought to formalize his agreement with Plaintiff beyond the signed financing term sheet, despite receiving her funds.

29. Instead, upon information and belief, Defendant immediately deposited the money into his personal account in New York.

30. Upon information and belief, Plaintiff's $150,000 was then used by Defendant in New York to offset the money Defendant previously owed to Code and for personal purposes unrelated to PLAYDAY.

31. From New York, Defendant issued two checks to Code for $100,000 and $150,000 on April 6, 2015 with specific instructions not to cash one until April 8 and the other until April 17, 2015. *See* Exhibit A at ¶ 42.

32. On or around April 17, 2015, Defendant's second check for $150,000 bounced. *See id.*

33. According to the Code complaint, Defendant was threatened with a work stoppage by Code and he resorted to having his father-in-law send a wire to Code for $100,000 so that Code would continue work. *Id.* at ¶ 71.

34. Code sent Defendant an e-mail demanding immediate payment of the outstanding balance of $1,184,852. *Id.* at ¶ 80. Upon information and belief, Code and Defendant have reached a settlement, the terms of which Plaintiff believes to have included payment in less than the full amount due and owing to Code.

35. Despite Defendant's deteriorating relationship with Code, Defendant continued to inform Plaintiff via communications from his home and other locations in New York City that the project was going well, thus misrepresenting the status of these funds.

36. When pressed about the timeline of the company, Defendant informed Plaintiff that PLAYDAY would be completed in August 2015 so that it could be used for the beginning of that year's football season.

37. However, in or around mid-August, as a result of conversations with Defendant, it became apparent to Plaintiff that there was no project and most of what Defendant had told her was a lie.

38. Plaintiff began reaching out to Defendant to recover her money, but she was met with silence or an excuse about a "meeting" or a "business issue" similar to the excuses Defendant was giving to Code. *See* Code Complaint, attached herein as Exhibit "A".

39. Plaintiff demanded her money back via text message on October 2, at 2:00pm, stating in relevant part, "Best that you just send me my money back. . . . No hard feelings, just

not interested in tying up the money an[y] longer." *See* Text message with Andy, attached herein as Exhibit "D."

40. Defendant's initial response was in line with his previous behavior. From his location in New York, he stated succinctly, "Hi love. Just on a call. Have some big meetings next week. Can I call you when done[?]" *Id.*

41. Defendant thereafter called Plaintiff from New York, requesting to keep the funds for a short time longer and incorrectly advising Plaintiff that there were tax issues with the return of her funds.

42. On October 20, 2015, Plaintiff sent Defendant an email with wire instructions for the return of her funds. A copy of this email with the wire information redacted is attached hereto as Exhibit "E."

43. Thereafter, Defendant failed to answer Plaintiff's phone calls and engaged in dilatory tactics to the extent that he responded at all. An example of this can be seen on Plaintiff's follow-up email on October 28, 2015 requesting information about the wire she had provided 8 days earlier. *See* follow-up email, attached hereto as Exhibit "F."

44. Plaintiff also unsuccessfully reached out to Defendant's wife, Alison, to request that the funds be returned. Alison's responses reiterated the lie that various Roc Nation artists were investors in PLAYDAY. *See* Alison text messages, attached hereto as Exhibit "G."

45. During the month of November, the two parties, through their attorneys attempted to facilitate the return of the $150,000 by Defendant to Plaintiff.

46. On or around November 20, 2015, the parties reached an agreement (the "Agreement") whereby the Defendants would immediately return $75,000 to Plaintiff and then make the remaining $75,000 payment over the course of four months.

47.     The Agreement also included a confidentiality provision whereby Plaintiff would be precluded from publicizing the conduct of Defendant or his wife. The Agreement also required that Defendant and his wife execute a confession of judgment and a promissory note for the remaining $75,000 which was to be paid in installments.

48.     The parties signed the agreement, presumably in good faith, which was promptly returned by Defendant, his wife, and their lawyer as a signatory. The executed Agreement reads in part:

> No later than November 25, 2015, and subject to the Parties' execution of this Settlement Agreement, payment in the aggregate amount of $150,000 shall be paid by respondent as follows: (i) $75,000 by wire transfer to the account designated by the Claimant in Exhibit A; and (ii) $75,000 by the delivery of a promissory note from Respondents to Claimant . . .The Note shall be secured by a confession of judgment executed by the Respondents . . .**Failure to deliver the Note, Confession of Judgment and the cash payment on or before November 25, 2015 shall be a default under the terms of this agreement and shall entitle the Claimant to immediate payment in the amount of $150,000.** (emphasis added). *Id*.

49.     After this agreement was executed, Defendant and his wife demanded to know to whom Plaintiff had spoken regarding the situation prior to the Agreement's signing. *See* Attorney email, attached herein as Exhibit "H."

50.     In light of the fact that the Agreement imposed no requirement that Plaintiff disclose those individuals with whom she had previously spoken, Plaintiff declined to answer. *See id*.

51.     On or about November 25th, despite the Agreement's prior execution, Defendant's attorney informed Plaintiff that Defendant no longer wished to proceed with the Agreement because Plaintiff would not tell them who she had spoken to prior to signing the Agreement. *Id*.

52. As detailed in the executed Agreement, Defendant and/or his wife were to deposit $75,000 into Plaintiff's account and to provide a Promissory Note and Confession of Judgment for the remaining $75,000. Defendant and his wife failed to make this payment.

53. By email dated November 27, 2015, Plaintiff gave Defendant an opportunity to cure the default. *See* 11.27.15 email, attached hereto as Exhibit "I."

54. To date, Defendant and his wife have never paid any portion of the funds owed to Plaintiff.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT
**(CONVERSION)**

55. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "54", inclusively, with the same force and effect as though more fully set forth herein at length.

56. Plaintiff provided $150,000 to Defendant based upon Defendant's deliberately false or misleading statements that he would return to her either (1) a valuable investment in the proceeds of PLAYDAY or (2) in the alternative, a return of her funds.

57. Defendant has conceded that he in fact owes $150,000 to Plaintiff.

58. Despite this, Defendant continues to retain Plaintiff's funds.

59. As a result of the aforementioned, Plaintiff was and continues to be damaged because of lost interest, continued legal fees, and disruption of her day-to-day activities in an amount to be determined at trial, but in no event less than $150,000 plus statutory interest at the rate of 9% pursuant to CPLR 5001.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT**
**(BREACH OF CONTRACT)**

60. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "59", inclusively, with the same force and effect as though more fully set forth herein at length.

61. As discussed more fully above, Plaintiff and Defendant entered into an Agreement which required Defendant and his wife to deposit $75,000 into Plaintiff's account by November 25, 2015 and to provide a signed promissory note for an additional $75,000, over the course of 4 months.

62. Plaintiff has fulfilled her obligations under the Agreement.

63. Defendant has failed to make the initial payment, provide the promissory note, or make any of the later scheduled payments, and has failed to cure this default.

64. Plaintiff continues to be damaged because of lost interest, continued legal fees, and disruption of her day-to-day activities in an amount to be determined at trial, but in no event less than $150,000 plus statutory interest at the rate of 9% pursuant to CPLR 5001.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT**
**(DECLARATORY JUDGMENT)**

65. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "64", inclusively, with the same force and effect as though more fully set forth herein at length.

66. Pursuant to the Agreement between the parties, any party forced to take legal action to enforce the Agreement shall be entitled to legal fees.

67. Plaintiff has been forced to take legal action to enforce the Agreement.

68. Defendant has disavowed the Agreement and is unlikely to pay absent a Court Order.

69. Therefore, Plaintiff seeks declaratory judgment that she is entitled to recover her legal fees as described in the Agreement.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT
### (UNJUST ENRICHMENT)

70. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "69," inclusively, with the same force and effect as though more fully set forth herein at length.

71. Defendant received $150,000 from Plaintiff with the expectation that Plaintiff would receive valuable consideration in return.

72. Defendant has provided Plaintiff with nothing but a series of excuses, delays, and legal fees, none of which constitutes valuable consideration.

73. Defendant has been enriched at Plaintiff's expense by receipt of Plaintiff's $150,000.

74. It would be unjust and inequitable to allow Defendant to retain the funds received from Plaintiff.

75. Plaintiff has been and continues to be damaged because of lost interest, continued legal fees, and disruption of her day-to-day activities in an amount to be determined at trial, but in no event less than $150,000.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT
### (FRAUD/FRAUDULENT MISREPRESENTATION)

76. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "76", inclusively, with the same force and effect as though more fully set forth herein at length.

77. Defendant deliberately misled Plaintiff to believe that his project PLAYDAY had substantial financial backing and was likely to be successful when, in reality, the concept lacked financial backing and was already behind on payments to Code, the primary architects of the product.

78. Defendant also falsely represented to Plaintiff that should anything happen to the company, Defendant would refund Plaintiff's funds.

79. Defendant made these misrepresentations and misled Plaintiff for the purpose of inducing her to invest in PLAYDAY.

80. Plaintiff reasonably relied on said representations when she provided $150,000 to Defendant as an "investment" in PLAYDAY.

81. As a result of this, Plaintiff has been and continues to be damaged because of lost interest, continued legal fees, and disruption of her day-to-day activities in an amount to be determined at trial, but in no event less than $150,000. Plaintiff also seeks punitive damages because said representations were false, known to be false, and the resulting damages were caused maliciously.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT
### (BREACH OF FIDUCIARY DUTY)

82. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "81," inclusively, as though more fully set forth herein at length.

83. Plaintiff and Defendant did not initially enter into a binding agreement. The only documentation between the parties was a financing summary, which was "for discussion purposes only; [with] no obligation on the part of any negotiating party until a definitive note purchase agreement [was] signed by all parties . . ." *See* Exhibit B.

84. The plain language of the agreement makes it clear that the financing summary was never meant to be binding; therefore, any funds collected as a result of it could only ever place Defendant in the position of a bailee or fiduciary.

85. Because Defendant was in the position of a bailee or a fiduciary, he had the responsibility to care for the funds and not to alienate them until the terms of the financing summary had been met which would have allowed him to use the funds for the business.

86. Defendant's use of those funds prior to the culmination of the agreement constituted misconduct and therefore a breach of his fiduciary duty. Furthermore, as outlined above, no agreement was ever reached. After the check was issued to Defendant, no further negotiations or discussions ever took place.

87. Finally, when Plaintiff demanded her money back, Defendant refused to send the money back. This also constituted a breach of the fiduciary relationship.

88. As a result of the aforementioned, Plaintiff was and continues to be damaged because of lost interest, continued legal fees, and disruption of her day-to-day activities in an amount to be determined at trial, but in no event less than $150,000.

**WHEREFORE**, Plaintiff demands judgment as follows:

    a. On her first cause of action, in an amount to be determined but believed to exceed $150,000 plus statutory interest at the rate of 9% pursuant to CPLR 5001;

b. On her second cause of action, in an amount to be determined but believed to exceed $150,000 plus statutory interest at the rate of 9% pursuant to CPLR 5001;

c. On her third cause of action, a declaratory judgment that Defendant is obliged to pay Plaintiff's legal fees in this action;

d. On her fourth cause of action, in an amount to be determined but believed to exceed $150,000 plus statutory interest at the rate of 9% pursuant to CPLR 5001;

e. On her fifth cause of action, in an amount to be determined but believed to exceed $150,000 plus punitive damages, attorney's fees and fees incident to instant action in addition to statutory interest at the rate of 9% pursuant to CPLR 5001;

f. On her sixth cause of action, in an amount to be determined but believed to exceed $150,000 plus statutory interest at the rate of 9% pursuant to CPLR 5001;

g. And for such further relief as this Court may find just and proper.

Dated: New York, New York
February 9, 2018

Yours, etc.,

**WEG AND MYERS, P.C.**
*Attorneys for Plaintiff*

By: _/s/ /Joshua L. Mallin/_____
Joshua L. Mallin, Esq. (JM0474)
Federal Plaza
52 Duane Street, 2nd Floor
New York, New York 10007
(212) 227-4210